The evidence on the record came from two witnesses, Ben Chicharro and Ben Maguire. Neither of these witnesses saw Mr. Flanders on the playground assaulting the deceased. However, Mr. Flanders himself was actually found at the scene of the assault. The jury then could infer that Mr. Flanders was one of the individuals assaulting the deceased. Now, the jury heard from these two witnesses, the 10-year-old and the 9-year-old. The 10-year-old was not specifically the one assaulted. We couldn't identify anybody. What he stated was that he heard that after the assault, the deceased was taken into the woods. The 9-year-old was a lot more specific. He stated that he couldn't identify any person. He stated that he saw the assault. But then his testimony was that the two perpetrators chased and driven him to a tree, tied him to a tree. One of the perpetrators pulled his firearm out, pointed at the children, and then shot the deceased. The firearm was not found on Mr. Flanders. It was found on his coat. But, Mr. Manning, if you concede that circumstantial evidence is enough for a reasonable jury to infer that your client participated in aiding and abetting at least of the assault, why doesn't that same evidence support aiding and abetting of the murder that took place at approximately the same time, especially given our standard, which, you know, as to whether no rational jury could make a finding on this evidence is a fairly deferential one? It is fairly deferential, but the evidence, in my view, in our view, only justifies assault. And the reason that we suggest that is because you see an assault occurring at 10 a.m. And then, out of nowhere, a person pulls a firearm out and shoots the victim. And our position is, in this case, is in line with oral universal homophony that we cited in our brief. In that case, what you see is an assault of a victim. And the next thing you know, a co-defendant pulls out a knife and stabs the victim. In that case, the sighting was approved by Chief Justice Reese Holland. And his position was, while there isn't specifically a potential assault, there's no independent further evidence that suggests that the defendant in that case, in our position, the defendant in this case, knew that a murder was actually going to occur. There's no evidence of that. You're seeing an assault. The very next thing you see is a firearm being pulled out of nowhere, and you see the victim. Can't the jury have made the inference from the circumstantial evidence, which includes, by the way, Sharon Tittle's testimony? You didn't mention that. You mentioned the young boys. Isn't it a proper inference that the Flanders and Harper ran this together and that the Flanders knew that Harper had the gun and that that's what they were there for, was to shoot the decedent? Our position is pure speculation. I mean, there's nothing that shows that at the time of the assault or any time before that, that Flanders knew specifically that his co-defendant had a firearm. But why couldn't the jury infer from the fact that there's testimony that places Flanders with the victim beforehand and there's cell phone records that show that there was communication between Flanders and Harper, and then we have the testimony beyond that about what happened with the assault and Flanders' phone being found there. Why couldn't the jury look at those things that preceded even the assault as evidence of planning? Why isn't that a reasonable inference that that included the planning of a murder? Well, because what you see is you see that at 7-26, based on record evidence, that's when the decedent called his cousin right to the board, and that's when we can assume that the assault actually started occurring because there's a nervous action or act on behalf of the decedent. And the assault occurred for 10 minutes. So now, in our position, in the 10-minute span of time, that's just proving that the intent of this action or act was to assault. I mean, there's nothing on the record. There's no words on the record that suggest that Flanders did anything to aid in the victim's act of murder itself. I mean, there are no words that came out and said, hey, let's kill the victim now, or let me help you kill the victim, or pull out the gun now and let's do this. There's nothing. There's no evidence on the record as to the necessary extra step to actually commit the crime, and that's what was cited in that recent Supreme Court case. It's in the brief. Why isn't the evidence of someone matching Flanders' description participating in dragging the victim to the tree and tying him up, which seems like positioning for purposes of a shooting, evidence of participation in the murder? Well, my position is that there was nothing. I mean, the testimony on the record was impressive. I'm referring to outlaw. It could be this guy. One, there's the statement of the 90-year-old was that he was in a position to see the firearm being pointed at him. That's what he testified. And the testimony from Officer James was that the victim was found in the bush area, you know, which was wood and which had trees. That's one. So there was no actual tying this victim to a tree or dragging the victim to a tree, number one. Number two, the victim wasn't tied to a tree because his body was laying flat at the time he was found. He was laying flat on the ground. That was the testimony on the record. And two, Soto's testimony was that he saw the firearm was pointed to the kids that were trying to steal the weapon, and then the victim was then shot immediately. There wasn't a pointing the firearm to the kids and then subsequent action. This didn't happen. There was no reaction to that. There was nothing on the record at that point to show that there was a reaction for Mr. Flank to come out and do anything more than just assault. Now, you're not arguing that Flanders actually had to possess a firearm to be convicted, are you? Well, in my position, under any embedding law, you would have to somehow, one, know that the firearm was being possessed and somehow assist or encourage or move the possessor of the firearm to somehow use that. That's all. Okay. But that gets back to my prior question. Isn't there enough here from this circumstantial evidence for the jury to infer that he had the firearm? In our position, absolutely not. Okay. Telephone calls in and of themselves, in my position, you would have to speculate as to what was actually being spoken, what they were talking about on the telephone. So that's mere conjecture and speculation as to what's actually occurring on the telephone. All right. Okay. We'll have you back on rebuttal. Excuse me. Sorry. I have one question on the juror bias issue, if we still have time. Yeah, he still has time. That is, you included in the joint appendix that the transcript of Wardeer reflects that there was another juror who was not struck by either the prosecution or defense who, like Ms. Lake, had family members who were victims of violence. And was left to remain on the jury. In light of that, how are you asserting that the seating of Ms. Lake rendered the jury biased or that she herself was necessarily biased? Well, the facts and circumstances under which defense counsel at trial evaluated Ms. Lake's, you know, her connection or her connection to, you know, family members and deceit and whatnot who were actually involved in a crime of violence, defense counsel was able to observe that and then make a judgment call as to whether or not he believed at that time that witness would be fair and impartial. But I guess that he at the time, the trial lawyer at the time, made a judgment call that he believed that witness would be fair and impartial. Now, he didn't have that option or opportunity with the juror that we have right now in question. But we have the district court, although it is after the fact, but holding hearing and making a credibility determination as to Ms. Lake's testimony, that she simply didn't hear the question. So is there something particular in the transcript or her testimony that you point to to suggest that we should not defer to the credibility finding of the district court on that point? Absolutely. She never demonstrated on the record that she was fair and impartial. She also stated that she believes that had she made that statement on the record, had she disclosed that fact on the record, then that would have been good enough to give the defense counsel a call to determine whether or not she would be fair and impartial. To get into the analysis on the record to determine whether or not she would be fair and impartial. And it would have been more of a spontaneous reaction as opposed to months and months after the fact being given the opportunity to respond. Thank you. Thank you, Mr. Manning. We'll have you back on rebuttal. And Mr. Andrews. Mr. Andrews, we have a tricky microphone there. Make sure we can hear that. And don't get too close to it. There's only like one zone we can be in there. All right. With respect to the issue of sufficiency, and whether or not there's sufficient evidence to show that the appellant, in this case, had the requisite intent to commit the offense of murder. We take the position that the court should view this evidence in its brutality. It's just not Mr. Flanders. Mr. Flanders is working in concert with Harper. And they're charged as such. They're charged with communicating an identity theory. And so the jury could legally convict Harper so long as they find that he was an active participant in the offense, or that he somehow encouraged it. So what we have is Flanders, even before the strike with Harper, sometime around 7 a.m., he's visiting the victim at his home. There's evidence that when the victim is in his house, getting ready to change his clothes, Flanders is outside and he's on a phone. There's a cell phone record that shows that he was in communication with a co-defendant, Harper. The evidence also shows, and this is uncontested, that he left the victim's house with the victim on foot, and that they traveled on a path that leads to the same field where the students say that they saw two individuals beating up one. Common sense tells us that those two individuals must have been Harper and Flanders, and here's why. We know that the victim made a phone call to his cousin, her name is Henderson. The phone records show that communication occurring somewhere around 7.36 p.m. We can infer then, and by the way, that phone, 64288888, was in fact Flanders' phone. So you have the victim utilizing the defendant's phone, which is Flanders, and he's on it. The person on the other end is saying he saw an exterior. That's also significant. He said, you know, I heard he refers to loud, angry voices in the background. So you can infer from that that we have a security point over here, just like in the video, and you have not just Flanders, but Flanders and someone else. We know there were two people because it's winter. We know that they're on it because the victim's phone. So the Flanders' phone was found in the field, some 10 feet away from the victim's glasses. So we know that a whole scenario occurred in the field, and the uncontested evidence, one of which was implicit in the testimony of the student, I think that's really an issue for the jury. But what we do have, probably evidence that they, either Flanders or Hartford, then dragged the victim into the brush area. This is occurring after they already assaulted him, after they already beat him up. And so the question is, if, in fact, the intent was simply to assault, simply to beat him up, that was already accomplished on the field, and the dragging of the victim into the brush area we submit is evidence from which the jury can infer that the intent of dragging him is to let him go behind closed doors or somewhere where he can't be seen, and finish him off. Mr. Andrews, is there any evidence you can point to that Flanders knew Hartford possessed a firearm before the offense took place? Yes, there's evidence from one of the witnesses, I can't recall, but one of the minority students, who said he saw, he didn't say which one, one of the individuals pointing the gun towards the students. Towards whom? Towards the students. Pointing it towards the students. Was that before or after the time that the victim was killed? I think just before, wasn't it? Okay, so you would say that the fact that one of the students, was it Mr. Soto or Angel Soto, said that he saw the gun pointed, that would be enough for a rational juror to infer that Flanders knew there was a gun there. Mr. Andrews, could I ask you to turn to the issue of the juror bias, and where is here, where as in this case, the juror, even after the fact, is never asked whether she could have been impartial or was impartial or whether the fact of having family members who were victims of violent crime affected her participation on the jury. Why isn't the Palulo standard met for clear error in our review of a Rule 33 motion? The way the government looks at it, I'm not sure how much import that carries, because I don't believe a juror, after the fact, should be permitted to either impeach or support the verdict. But it's not impeaching or supporting the verdict, this goes to whether the fact of having family members who were victims of violent crime affected her impartiality. Why wasn't that question asked? Either by the district court or suggested perhaps by the government? And I saw it in a sense as impeaching the verdict, because if a juror said, oh yeah, I found the defendant guilty, you know what, I was biased. Or, I found the defendant guilty and I wasn't biased. I think, the way we look at it, the burden actually is on the defendant, he's the one that's accusing, or asserting that there was juror bias. That requires the defendant, in this case, to show implied bias. But even that implied bias, I think, comes into play only if the defendant first makes that first step of not being biased. Can you keep your voice up, please, Mr. Anderson? It first has to show that there was dishonesty. Well, don't we have a combination of circumstances here that should give us some concern? Because that question, which is the sine qua non of juror impartiality, was never asked of this juror. So, she never stated one way or the other whether it did affect her impartiality. And then in the post-trial hearing, she initially was not forthcoming about how many family members, in fact, had been victims of violent crime, and arguably made inconsistent statements along those lines. So, shouldn't that give us concern, that she was not initially forthcoming, even in the post-trial hearing, as to which family members were victims of crime? The way I interpreted that is, these two cousins, as she subsequently indicated, were not close to her, that she considered. It's almost like, who is this? It didn't come to her mind, simply because she does not have what we would refer to as a close social relationship with them. It is only when the question was asked, do you know someone named Alonzo? And then she said, oh, yeah, yeah, yeah, I do. Who's that? Well, that's my cousin. He's been alive a long day. But, when you analyze the rest of her statement, with respect not just to Alonzo, even the other ones who died, again, with the government that had to ask that question because of the admission that Alonzo was violent, in the motion, that sort of triggered her, I said, oh, yeah, you have a cousin by the name of Alonzo, but she's not close. And I'm saying, the interpretation of my takeaway from that is that these cousins were so far distant from her that she didn't even remember, consider them at the time the question was asked. In fact, I think her words were, and this is with respect to those two, he said, with respect to the cousins, he said, I know about the other two, but like I said, I don't know about the other two, so I don't really get in my mind like that. And I end up with that, I didn't mean for the other cousins, but we're not close. So, when you talk about a relative, that's the interpretation I have from that. And I would say that given those set of facts, the court's conclusion that she was not dishonest cannot be considered clear. You pointed her testimony, but what should we make of the fairly unusual process that was used here? The Supreme Court suggested in Remmer that having a post-trial hearing would be a way to try to establish that there was not bias or partiality on the part of a juror. But here, there was an ex parte hearing that was held where the prosecutor alone had the opportunity to do an interview before it was made available to both sides. I can see that is what occurred. I can't give you the rationale of why people opted to put it that way. We have a sort of understanding, sort of like a discouraging... Mr. Andrews, please try to speak. It's sort of like a discouraging of lawyers approaching jurors and speaking to them about the case, even though the case is finished. So out of caution, avoid any issues, we opted to get authorization from the court to contact the juror. There have been times in the past where we just go talk to the juror because the case is over. But we felt, you know, let's play it safe. So we filed a motion asking the court basically for permission to interview the juror, not to have a hearing. Instead of the court saying, yes, go ahead and go interview the juror, which, had that occurred, it would have been almost the same thing that we are. The court said, yeah, you interview the juror, but it has to be monitored by an advanced juror. They said what? It has to be monitored by the magistrate. So that's why we ended up before Judge Cannon. I didn't really see that, and I still don't see that as a hearing as such. It was really the magistrate complying with the court's order. Yeah, government, you can go ahead and interview. I see my time is up. But I want the magistrate there. And in fact, the magistrate didn't really participate. There's no questions for me, but I was just basically making a record of it. Okay. So for those reasons, we would say that the defendant has not shown guilty bias in this case. I ask that the court perform the judgment. Okay, thank you, Mr. Andrews and Mr. Manning. There was a hearing, that ex parte hearing, because the magistrate asked on the record. First of all, he was kind of confused as to what the cost was. But I think on the record, he stated that he was going to issue a report and recommendations for the district. So they were actually supposed to be taken based on a hearing that was done ex parte. But just very briefly, back on that ruling that I mentioned, the concession is clear. I mean, the concession is clear that there was no reaction time from the time that the co-defendant pulled the firearm to the time that he shot the victim. And that's the question. When Mr. Flanders had noticed that the firearm was in play gear, what reaction time did he have? The record evidence right now is clear that there was no reaction time. There was no time to then somehow facilitate anything or event the next, the actual murder. Now, back to Rosemond, the United States Supreme Court case. The Supreme Court requires specific intent as to each and every crime that the defendant is accused of by aiding or abetting the victim. And I'll answer your question. That's the rule for me. Well, I understand that. And I understand what Rosemond says. But isn't, I mean, and I asked Mr. Andrews the question, what evidence was there that Flanders knew that he had a gun before the gun was used? And the testimony of one of the statements was that it was pointed before they dragged the victim behind the bushes. And now you say there was no time to react. But the question for us as a reviewing court is could a rational juror inferred from that fact that he knew all along that Harper had a gun? If I may, just take us back to the testimony at page 445 of the joint opinion. The question was, after they chased him to a tree, what happened next? Tied him up. They what? They tied him up. And then what happened next? Pulled a gun. They put the gun after the children. What do you mean they pointed? Who pointed the gun? One of them. Now, after they pointed the gun and killed him, what happened next? They shot him. There was no testimony on this record. There was a dragging event after the firearms. And also I think forensic evidence that's on the record evidence demonstrates that the victim was standing up when he was shot. And I can demonstrate that based on the record. The shell casing was found six feet away from the body. The testimony of Officer James was that when he entered into the bush area, the only thing that he could see of the decedent were his feet. The rest of the body was actually in the bush area. But common sense tells us that if the body's in the bush area and the firearm was shot, and the shell casing is in the bush area, it won't travel six feet if he didn't go in the bush. Now, the testimony of Detective, I mean, Dr. Landron, was that the firearm was pointed at the actual projectile that entered the decedent at an upward angle on the right side of his cheek. And the firearm was within six inches of the face when the victim was shot. So it's our position that the tying to the tree event and that whole series of events can be lied by the record evidence and in a first-amounts case law, it can be excluded. But the realities are, based on the testimony, so that he was the only person to testify as to the pulling of the firearm and getting all the timeshot, his testimony clearly on the record was the firearm was pointed to the foot and the decedent was shot. And that's what's on the record. So it's our position that there was no reaction. There was no action after the firearm was pulled to show the planner made any kind of effort to aim and assist in the act of murder. Now, just one little note real quick. In Sharon Tittle's testimony, she testified that Harper told the planners to let me go. And I think the district court had it back by mistake, whereas the district court would tell Harper to let me go. But it was actually Harper who told the planners to leave the scene. Mr. Manning, on the Rule 33 motion, while it would certainly seem the preferable practice to hold a hearing involving all interested parties, which is what the Supreme Court had suggested and not an ex parte hearing or interview in these circumstances, is there anything in that interview or hearing that you point to to suggest that the prosecutor in any way swayed the testimony of the juror or pressured that juror in any way? I cannot say that this prosecutor swayed the jury in any given direction, but I think that to allow a process where you have an ex parte opportunity to tip off the juror as to what questions that she would be asked on months later, I think that's fundamentally in her interest because it should be an interactive process. As soon as you redirect, I should be right then and there able and available to talk to them as soon as you put Thank you. Okay, thank you Mr. Manning. And we thank both counsel for their arguments and for their work on this case and we'll take the matter under advice.